Filed 12/17/14  P. v. Machuca CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B249032 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA384881) |
| v. | |
| GREGORIO MACHUCA and DONTAY PRICE, | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Craig J. Mitchell, Judge.  Affirmed as modified.

Mark R. Feeser, under appointment by the Court of Appeal, for Defendant and Appellant Gregorio Machuca.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant Dontay Price.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Paul M. Roadarmel, Jr. and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Appellants Gregorio Machuca and Dontay Price were each convicted of one count of attempted premeditated murder (Pen. Code,[1] §§ 664, 187, subd. (a)) with true findings on gang enhancement allegations (§ 186.22, subd. (b)) and firearm enhancement allegations (§ 12022.53, subds. (c), (e)). Machuca also was convicted of one count of possession of a firearm by a felon (§ 12021, subd. (a)), with a separate true finding on a gang enhancement allegation. On appeal from their judgments of conviction, Machuca and Price argue the evidence was insufficient to support the gang enhancements, and the trial court erred in allowing improper gang expert testimony. Price further contends there was insufficient evidence to support his attempted murder conviction, and the trial court erred in failing to instruct the jury on the lesser included offense of attempted voluntary manslaughter. Machuca also asserts the trial court committed certain errors in sentencing him. We affirm the judgments of conviction for both Machuca and Price, but order the modification of the trial court's written sentencing orders for Machuca to correct the sentencing errors.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.     The Charges

The Los Angeles County District Attorney charged Machuca and Price with one count of attempted willful, deliberate, and premeditated murder (§§ 664, 187, subd. (a)) [count one], and Machuca with one count of possession of a firearm by a felon (§ 12021, subd. (a)) [count two]. As to the attempted murder count, it was alleged that a principal personally and intentionally discharged a firearm during the commission of the crime (§ 12022.53, subds. (c), (e)). As to both counts, it was alleged that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)). Machuca and Price each pleaded not guilty to the charges and denied the sentence enhancement allegations.

---

[1]     Unless otherwise stated, all further statutory references are to the Penal Code.

## II.     The Evidence at Trial

### A.     The Shooting

On May 25, 2011, at about 2:40 p.m., Los Angeles Police Detectives Alex Jacinto and Timothy Stack were riding in an unmarked police vehicle in the area of Venice and Rimpau Boulevards.  As their car was stopped at an intersection, Detective Jacinto saw Machuca and Price, whom he knew from prior police contacts, leaving a shopping center parking lot in a silver Ford Focus.  Price, who is Black, was the driver, and Machuca, who is Hispanic, was the passenger.  Price was wearing a red hat.  Approximately 10 to 15 minutes later, a shooting occurred on Washington Boulevard about two miles from where Detective Jacinto had seen Machuca and Price.

At about 2:50 p.m., Leon White was driving on Washington Boulevard when he heard two to four gunshots.  White saw a heavyset Hispanic man standing about 25 yards from White's car and holding a dark-colored gun in his right hand.  The shooter had his arm raised to shoulder height and was pointing the gun in the direction of a man riding a bicycle.  The man abandoned the bicycle and fled on foot.  The shooter then got into a gray vehicle that headed at a normal rate of speed in the same direction as the man who dropped the bicycle.  White tried to follow the vehicle as he called 911.  While speaking with operator, White heard a second round of gunshots coming from a block away.  In his 911 call, White described the suspect vehicle as a gray Ford Focus and the shooter as a Hispanic man weighing 230 pounds and wearing blue jeans and a dark shirt.  In an interview with the police shortly after the shooting, White described the shooter as a heavyset Hispanic male and the driver of the vehicle as a Black male.  At a field show-up held later that day, White identified Machuca as the shooter.

At the time of the shooting, Laura Dampf and a friend were sitting inside Dampf's parked car on Washington Boulevard.  Dampf heard multiple gunshots in close proximity to her vehicle and crouched down in the driver's seat, but occasionally peered up through her car window.  Dampf saw a heavyset Hispanic man in a black charcoal shirt chasing another Hispanic man on a bicycle.  The man being chased abandoned the bicycle and ran away, and the other man got into a grey car that was stopped near Dampf's vehicle.

Dampf could see the silhouette of the driver, who was a smaller, possibly African-American man. As the gray car sped away, Dampf wrote down its license plate number and then called 911. Dampf told the 911 operator that she heard approximately five shots and described both the suspect and the victim as Hispanic men wearing dark clothing. She also said that the suspect got into a small silver or gray car and recited the license plate number. In an interview with the police at the scene, Dampf described the shooter as a heavyset Hispanic man and the driver as a Black male. She was unable to positively identify Machuca at a field show-up held later that day, but felt that he could have been either the shooter or the victim based on his physique.

Three unidentified individuals also called 911 to report the shooting. One caller reported hearing five to eight gunshots down the street from his home. Another caller heard six rapid-fire shots and saw two Hispanic men running on Washington Boulevard. He then heard additional gunshots from further down the street. The third caller reported seeing a heavyset Hispanic man trying to shoot another Hispanic man on a bicycle as the shooter chased him down the street.

### B.    The Police Investigation

Approximately 15 minutes after seeing Machuca and Price leave the shopping center parking lot in a Ford Focus, Detectives Jacinto and Stack received a police radio broadcast of the shooting, including a description of the suspect vehicle. As they were driving toward the scene, Detective Jacinto spotted a Ford Focus parked in the driveway of Machuca's residence, which was less than 100 feet from where the second round of shots was fired. The detectives decided to stop at the residence to investigate. As they approached the driveway, Detective Jacinto saw a Black man running from the back of the residence. The man jumped over a wall and was able to flee on foot. Detective Jacinto did not see the man's face, but observed that he was similar to Price in height and built and was wearing a red hat. Detective Jacinto placed his hand on the hood of the Ford Focus, which was warm.

4

All of the occupants of the residence, including Machuca, were ordered outside. After obtaining consent to search the residence, the police recovered a long-sleeved black shirt and a short-sleeved black shirt from Machuca's bedroom, and two bullets from a dresser drawer. Machuca was arrested and taken into custody. Later that day, the investigating officers returned to the residence with Machuca, who told them to look inside the air filter compartment of a pick-up truck parked in the driveway. The officers recovered a Smith & Wesson nine-millimeter semi-automatic handgun with an empty magazine from the air filter compartment, and a gun holster from the garage.

Dampf later identified the Ford Focus found at Machuca's residence as the car that she had seen during the shooting. The police ran the license plate number on the vehicle in the Department of Motor Vehicles (DMV) database, which showed that the registered owner of the Ford Focus was Price's mother.[2] In a subsequent search of the vehicle, the police recovered a DMV registration card in Price's name.

Shortly after the shooting, the police found six spent nine-millimeter casings on the ground near the corner of Washington Boulevard and Thurman Avenue. Another six casings and two bullet fragments were found about four blocks away near the corner of Washington Boulevard and Carmona Avenue. The casings were dented due to traffic in the area. Approximately 10 feet from the location of the second set of casings, the police observed bullet impact marks on a pole and wrought iron gate, and recovered a bullet from a parked car with a shattered window. The spent casings and bullet fragments were later matched to the firearm that was seized from the truck at Machuca's residence. The police were not able to identify the victim of the shooting, nor did they find any evidence of injury at the scene.

The day after the shooting, the police collected video surveillance footage from a business in the area. The video footage showed a Hispanic man believed to be the victim riding a bicycle on Washington Boulevard while looking over his shoulder. The man

---

[2] The license plate number that Dampf reported to the police was 4GDZ756. The license plate number of the Ford Focus found at Machuca's residence was 4JDZ756.

then turned and rode his bicycle in the opposite direction as he continued to look to the rear. After veering into the street and almost colliding with a vehicle, the man dropped the bicycle and fled on foot. The video footage also showed another Hispanic man whom the police believed to be Machuca walking in the same direction as the victim while holding an object in his hand. A short time later, a car resembling a Ford Focus drove into an alley near Washington Boulevard, and then drove back out of the alley as soon as Machuca crossed the street.

### C. The Gang Evidence

Los Angeles Police Officer Sean Stablewski testified as an expert on the 18th Street Gang. He had been a sworn police officer for eight years and a gang officer for four years. In 2008, after two years on patrol, Officer Stablewski was assigned to the gang enforcement detail for the Southwest Division where his primary duties were to monitor and suppress criminal activity by the 18th Street Gang. The following year, he transferred to the gang enforcement detail for the Wilshire Division where he continued to focus on the criminal activities of the 18th Street Gang. As a gang officer, Officer Stablewski interacted with gang members on a daily basis, investigated gang-related crimes, and studied gang culture. He estimated that he had over a thousand contacts with gang members, including both criminal arrests and consensual encounters in the field.

Officer Stablewski testified that gangs are highly territorial and fight to claim certain geographic areas as their own. Gangs members mark their territory by writing graffiti that identifies their gang or moniker, and they disrespect rival gangs by defacing their rivals' graffiti. Fear, respect, and reputation are important aspects of gang culture. A gang that commands respect is able to conduct illegal activities without interference from rival gangs or the surrounding community. A gang builds its reputation and gains respect by committing crimes and instilling fear in its rivals and community residents. Gangs typically operate under a hierarchical structure that is comprised of "soldiers" who commit crimes, "shot callers" who direct the gang's activities, and "original gangsters" who resolve disputes with rival gangs.

6

According to Officer Stablewski, the 18th Street Gang is one of the largest gangs in the world and has 8,000 to 12,000 members in Los Angeles. It is a predominantly Hispanic gang, but includes some Black and other non-Hispanic members. While the gang does not identify with a specific color, its members use the number "18" in various combinations as a common symbol in their tattoos, clothing, graffiti, and hand gestures. The gang claims an approximately five-square-mile area in Los Angeles as its territory, and its main rivals are gangs that border that geographic area. The shooting in this case took place in the territory claimed by the 18th Street Gang. Officer Stablewski opined that 18th Street gang members, both individually and collectively, have engaged in a pattern of criminal activity, and that the primary activities of the gang include murder, attempted murder, robbery, and assault. Specific crimes committed by 18th Street gang members in the past included grand theft and unlawful taking of a vehicle in September 2008 and felony vandalism in July 2008.

Officer Stablewski was personally familiar with Machuca based on their prior contacts in the field. Machuca had been a member of the 18th Street Gang for about 10 years and went by the moniker "Al Capone." He had a number of gang-related tattoos on his arms, hands, legs, chest, back, and head, and had admitted his membership in the 18th Street Gang to Officer Stablewski during a stop in 2009 or 2010. Officer Stablewski was familiar with Price based on information obtained from other officers. Price had been a member of the 18th Street Gang for over 15 years and went by the moniker "Demon." He had prominent gang-related tattoos on his head, neck, chest, abdomen, and forearm, and had admitted to other officers that he was a member of the 18th Street Gang. In photographs presented at trial, both Machuca and Price had 18th Street Gang tattoos on their backs that were in the process of being completed, which Officer Stablewski opined showed their active membership in the gang.[3]

---

[3] Three other police officers testified about their prior contacts with Machuca or Price. Detective Marla Kiley stated that, while working as a gang officer in June 2005, she had contact with Price at a jail facility, and she knew both Price and Machuca to be members of the 18th Street Gang. Officer Hector Marquez testified that, in August 2009,

When presented with a hypothetical question based on the facts of the case, Officer Stablewski opined that the shooting was committed for the benefit of a criminal street gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members. Officer Stablewski testified that the shooting would benefit the gang by allowing it to protect its claimed territory while instilling fear and intimidation within the community. The crime also would benefit the perpetrators by enhancing their reputation in the gang and earning the respect of their fellow gang members. Officer Stablewski noted that the shooting occurred in broad daylight in gang territory, and after the first shots were fired, the perpetrators continued pursuing the victim in their car and then fired a second round of shots at him.

On cross-examination, Officer Stablewski was presented with an alternative hypothetical in which both the shooter and the victim were young Hispanic men in dark clothing, but their membership in a gang was unknown and there were no gang signs, colors, or names used during the shooting. Officer Stablewski testified that if neither the shooter nor the victim was a known gang member and there were no other indicia of gang involvement, he could not conclude that the shooting was for the benefit of a gang. On the other hand, if the shooter was a known gang member and the crime occurred in gang territory, then the shooting would have been for the benefit of the gang even if the victim's gang membership was unknown. While acknowledging that not every crime committed by a gang member was intended to benefit his or her gang, Officer Stablewski explained that he based his opinion that the shooting in the prosecution's hypothetical was gang-related on the totality of circumstances presented.

---

he observed Price and another known 18th Street Gang member in a gray Ford Focus in the gang's territory. Officer Timothy Estevez recounted that, based on his experience as a gang officer, he was familiar with Machuca's residence, which was a place where gang members were known to congregate.

8

**III.    The Verdict and Sentencing**

The jury found both Machuca and Price guilty of attempted willful, deliberate, and premeditated murder (§§ 664, 187, subd. (a)), and found Machuca guilty of possession of a firearm by a felon (§ 12021, subd. (a)).  As to the attempted murder count, the jury made true findings on the firearm enhancement allegations (§ 12022.53, subds. (c), (e)), and as to both counts, the jury made true findings on the gang enhancement allegations (§ 186.22, subd. (b)).  In a bifurcated proceeding, Price admitted to one prior serious or violent felony conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).   Price was sentenced to state prison for an aggregate term of 30 years to life.  Machuca was sentenced to state prison for an indeterminate term of 15 years to life and a determinate term of 23 years and four months.  Both Machuca and Price thereafter filed timely notices of appeal.

**DISCUSSION**

**I.    Sufficiency of the Evidence Supporting the Gang Enhancements**

On appeal, Price and Machuca join in challenging the sufficiency of the evidence supporting the jury's true findings on the gang enhancements alleged as to each count. They specifically contend that the prosecution failed to meet its burden of proving that the 18th Street Gang was a criminal street gang within the meaning of section 186.22, subdivision (b) because the testimony of the prosecution's gang expert was insufficient to establish the primary activities element of the statute.  We conclude that the jury's gang enhancement findings were supported by substantial evidence.

**A.    Relevant Law**

The California Street Terrorism Enforcement and Prevention Act was enacted by the Legislature with the express purpose "to seek the eradication of criminal activity by street gangs."  (§ 186.21.)  One component of the statute is a sentence enhancement provision for felonies committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1).)  A "criminal street gang"

9

is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in [§ 186.22, subd. (e)], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

To prove a gang is a "criminal street gang," the prosecution must establish that the gang has as one of its "primary activities" the commission of one or more of the crimes enumerated in section 186.22, subdivision (e), and has engaged in a "pattern of criminal gang activity" by committing two or more such "predicate offenses." (§ 186.22, subds. (e), (f); see also *People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*).) "The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities. [Citations.]" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1465; see also *Gardeley, supra,* at pp. 619-620 [expert testimony "provided much of the evidence necessary to establish that the [defendant's gang] met the [gang statute's] definition of a "criminal street gang'"].) A jury's true finding on a gang enhancement is generally reviewed on appeal for substantial evidence. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

### B. The Gang Enhancements Were Supported by Substantial Evidence

At the trial of Machuca and Price, the prosecution offered the expert testimony of Officer Stablewski to prove the primary activities element of the gang enhancement allegations. The prosecutor initially asked Officer Stablewski what "kind of crimes" were committed by members of the 18th Street Gang, to which he responded: "Murder, attempt[ed] murder, robbery, assault, other felony crimes. They're not picky about what they do. If it's illegal, they have . . . probably done it once." Later in the testimony, the prosecutor and Officer Stablewski engaged in the following exchange:

[Prosecutor]: In your opinion, have members of 18th Street individually or collectively engaged in a pattern of criminal gang activity?

[Officer Stablewski]: Yes.

[Prosecutor]: And in your opinion, what are those primary activities?

[Officer Stablewski]: Primary activity of a gang member, again, is the commission of crimes, murder, attempt[ed] murder, robbery, assault, and other felony crimes.

[Prosecutor]: And you're specifically referring to 18th Street?

[Officer Stablewski]: Yes.

[Prosecutor]: What are you basing that opinion on?

[Officer Stablewski]: My personal duties as a police officer and handling the gang for four years.

Appellants argue the evidence was insufficient to establish the primary activities of the 18th Street Gang because Officer Stablewski did not describe any specific offenses that 18th Street gang members consistently and repeatedly committed, but rather testified in conclusory terms that any gang member's primary activity was the commission of crimes. In making this argument, however, Appellants are focusing on an isolated and incomplete portion of Officer Stablewski's testimony. The question posed by the prosecutor specifically asked about the primary activities of the 18th Street Gang. Although Officer Stablewski initially responded that the "primary activity of a gang member . . . is the commission of crimes," he then immediately identified those crimes as including "murder, attempt[ed] murder, robbery, [and] assault." In response to the prosecutor's next question, Officer Stablewski further clarified that his testimony about the primary activities was "specifically referring" to the 18th Street Gang, and not simply to any gang member. He also explained that his opinion about the gang's primary activities was based on his years of experience as a gang officer dealing with the 18th Street Gang. As this Court observed in *People v. Margarejo* (2008) 162 Cal.App.4th 102, 107, "[o]rdinary human communication often is flowing and contextual. Jurors know this. Repetitive and stilted responses make up one kind of direct examination, but not the only kind." When Officer Stablewski's testimony is considered as a whole, it is

11

sufficient to establish that members of the 18th Street Gang consistently and repeatedly committed one or more of the crimes enumerated in section 186.22, subdivision (e).

Appellants also assert that Officer Stablewski's testimony lacked an adequate foundation because he did not connect his knowledge as a gang enforcement officer to the primary activities of the 18th Street Gang. Appellants note that Officer Stablewski did not identify any specific instances of the gang's primary activities, nor did he describe when, where, or how he obtained the information about those particular crimes. Contrary to Appellants' claim, however, the foundation for Officer Stablewski's opinion on the 18th Street Gang's primary activities was well-established. As described by Officer Stablewski, he had been a sworn police officer for eight years and a gang enforcement officer for four years. His primary job duty as a gang enforcement officer was to monitor and suppress criminal activity by the 18th Street Gang. His work experience included numerous custodial and non-custodial interviews with gang members, probation and parole compliance checks of residences occupied by gang members, and investigations of gang-related crimes. He also gathered gang intelligence on a daily basis in the field through his personal contacts with gang members, many of whom spoke to Officer Stablewski about their gang's culture, rivalries, and activities.

Officer Stablewski thus testified to having extensive training and experience in gang crime and culture, thereby demonstrating the special knowledge, skill, experience and training sufficient to qualify him as an expert. (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330 [gang expert's "eight years dealing with the gang, including investigations and personal conversations with members, and reviews of reports suffices to establish the foundation for his testimony" about the gang's primary activities]; *People v. Duran*, *supra*, 97 Cal.App.4th at p. 1465 [gang expert's "personal experience in the field gathering gang intelligence, contacting gang members, and investigating gang-related crimes" provided adequate foundation for his testimony about the gang's primary activities].) The mere fact that Officer Stablewski failed to provide a specific example of a murder, robbery, or assault committed by a particular 18th Street gang member in describing the gang's primary activities did not render his testimony

conclusory or beyond the scope of his expertise. "'""Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility.'" [Citation.]' [Citation.]" (*People v. Eubanks* (2011) 53 Cal.4th 110, 140.)

Under these circumstances, Appellants' reliance on *In re Alexander L.* (2007) 149 Cal.App.4th 605, is misplaced. In that case, the Court of Appeal reversed a true finding on a gang enhancement on the ground that the gang expert's testimony was insufficient to establish the primary activities element. When asked about the primary activities of the defendant's gang, the expert testified, "'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.'" (*Id*. at p. 611.) However, the expert did not explain the basis for his knowledge and conceded on cross-examination that the vast majority of crimes involving the gang were graffiti-related. (*Id*. at pp. 611-612.) As this Court explained in *People v. Margarejo*, *supra*, 162 Cal.App.4th at p. 107-108, the expert testimony in *Alexander L.* was insufficient to support a gang enhancement finding because the witness did not identify the gang's primary activities, equivocated on direct examination, and contradicted himself on cross-examination. Officer Stablewski's testimony, in contrast, did not suffer from these deficiencies, and when considered as a whole, was sufficient to prove the primary activities element of the gang enhancement allegations. The jury's true findings on the gang enhancements were therefore supported by substantial evidence.

## II.    Admission of Gang Expert Testimony

Price and Machuca also argue that the trial court violated their constitutional right to due process by admitting improper expert testimony that usurped the function of the jury. In particular, they assert that the trial court erred in allowing Officer Stablewski to testify on the ultimate issue of Appellants' subjective intent in committing the charged crimes. This argument, however, is not supported by the record.

13

### A. Relevant Law

Gang expert testimony may properly be admitted to prove motive and intent. (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512-1513; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1549-1551; *People v. Valdez* (1997) 58 Cal.App.4th 494, 507-509.) Indeed, expert testimony repeatedly has been deemed admissible to prove the motivation for a particular crime and whether the crime was committed to benefit, promote, or assist a gang. (*People v. Garcia, supra*, at p. 1513; *People v. Gonzalez, supra*, 126 at p. 1550; *People v. Valdez, supra*, at p. 509.) Although a gang expert may not offer an opinion on a specific individual's subjective knowledge or intent, the culture and habits of criminal street gangs are appropriate subjects for expert testimony and therefore admissible. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946-947 (*Gonzalez*); *Gardeley, supra*, 14 Cal.4th at pp. 617-618.) In addition, a gang expert generally is allowed to provide opinion testimony on the basis of facts presented in hypothetical questions that ask the expert to assume their truth. (*People v. Vang* (2011) 52 Cal.4th 1038, 1045 (*Vang*); *Gonzalez, supra*, at pp. 946-947; *Gardeley, supra*, at pp. 617-618.) "'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' [Citations.]" (*Vang, supra*, at p. 1048.)

In *Vang*, the California Supreme Court reaffirmed its prior holdings that a gang expert may properly testify that a particular crime was committed for the benefit of a gang even though such testimony embraces an ultimate issue to be decided by the jury. (*Vang, supra*, 52 Cal.4th at p. 1048.) As the Supreme Court explained, while a gang expert may not testify whether the defendant committed a particular crime for gang purposes, the expert "properly could . . . express an opinion, based on hypothetical questions that tracked the evidence, whether the [crime], if the jury found it in fact occurred, would have been for a gang purpose. 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*Ibid.*) The Supreme Court acknowledged that the expert's opinion, if found to be credible,

could "cause the jury to find the [crime] was gang related," but reasoned that "'this circumstance makes the testimony probative, not inadmissible.'" (*Id*. at pp. 1048-1049.)[4]

### B. The Gang Expert Testimony Was Properly Admitted

Over Appellants' objection at trial, the prosecutor posed the following question to Officer Stablewski: "Assume that two 18th Street gang members are in 18th Street Gang territory. And this is back on May 25th, 2011. And one of the 18th Street Gang members is the driver of a car. And the other 18th Street Gang member is a passenger, the front passenger in the same car. There's no one else in that car being just the two of them. Assume it's around 10 until 3:00 in the afternoon. Further assume that the defendant who's driving—or, I'm sorry, the individual, 18th Street member who's driving the car, pulls up to a corner in the 18th Street Gang territory. He pulls up, he stops the car, and the passenger gets out, opens the door and pulls out a nine-millimeter handgun. And then he fires that handgun six times at a male Hispanic who's on a bike. That male Hispanic takes off. The shooter gets back in the same car and shuts the door. That car then takes off, and it follows the male Hispanic who is on the bike. . . . I want you to assume further that the same car [that] is then being driven by the same person stops and the same shooter gets out, pulls out a gun, and fires six more times at the same male Hispanic. The shooter then gets back inside of the same car and the same driver drives away. Do you have an opinion as to whether or not that crime was committed at

---

[4] In *Vang*, the Supreme Court disapproved of the case primarily relied on by Appellants—*People v. Killebrew* (2002) 103 Cal.4th 644 (*Killebrew*)—to the extent that *Killebrew* could be read "as barring, or even limiting, the use of hypothetical questions." (*Vang*, *supra*, 52 Cal.4th at p. 1047, fn. 3.) As the Supreme Court explained, *Killebrew* "overlooked the critical difference between an expert's expressing an opinion in response to a hypothetical question and the expert's expressing an opinion about the defendants themselves. *Killebrew* stated that the expert in that case 'simply informed the jury of his belief of the suspects' knowledge and intent on the night in question, issues properly reserved to the trier of fact.' [Citation.] But to the extent the testimony responds to hypothetical questions, as in this case (and, it appears, in *Killebrew* itself), such testimony does no such thing." (*Id*. at p. 1049.)

the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, or further, or assist criminal conduct by gang members?"

In response to the prosecutor's question, Officer Stablewski testified as follows: "I would believe that that situation would benefit the gang because of not knowing the day of the week, but I believe it was a weekday, and using the time of day, that would definitely cover the fear, intimidation part. That's when two people in a car are driving around at 3:00 in the afternoon, and they're going to approach a male Hispanic and attempt to shoot at him, get back in the car and continue to shooting, that to me it definitely puts both people wanting to be there. Nobody would continue driving and, hey, let's try and get him again, if that driver of the car and that shooter inside the car, they don't want to be there. That goes back to protecting the territory, it happened within a gang area, the time of day, and pretty much the no fear factor to shoot somebody at 3:00 in the afternoon, right before rush hour traffic, it definitely would be in benefit of the gang due to the fear and intimidation factor within the community. And then what also you have, is you have respect of your peers. You're going to show your loyalty to the gang and you're going to get new respect that you never had because they would talk about it like I'm talking about it, that, a, it's crazy to shoot someone at 3:00 in the afternoon, they're going to look up to them, like, wow, these guys are pretty down for our cause here. They're definitely defending, doing their job, and it's going to be an example to newer members that this happened and this happened, and these guys are setting the bar pretty high for younger members. So I go to the fear and intimidation, the respect and the loyalty, and protecting territory, and this person possibly could have been a rival member."

Appellants contend that the trial court erred in admitting this testimony. The record reflects, however, that the prosecutor asked Officer Stablewski a permissible fact-based hypothetical question that was designed to elicit his expert opinion as to whether the crimes at issue were committed for the benefit of the 18th Street Gang, and with the specific intent to promote, further, or assist in criminal conduct of the gang. In presenting this hypothetical scenario, the prosecutor did not pose any questions about the particular

16

state of mind of Machuca or Price, or whether either of them had any specific knowledge or intent. In response to the prosecutor's inquiry, Officer Stablewski testified that, based on the facts posed in the hypothetical, it was his opinion that the crime described would have been committed for the benefit of the gang and with the specific intent to promote criminal gang conduct. Officer Stablewski did not express an opinion as to whether Machuca or Price actually committed the crime, or took any action for the benefit of their gang. Rather, Officer Stablewski opined that a shooting committed in the manner described by the prosecutor's hypothetical would have been done for gang purposes.

Appellants claim that the prosecutor's hypothetical question was designed to elicit an improper opinion on their subjective intent because it included a specific reference to the date of the shooting and the name of their gang. However, as the Supreme Court held in *Vang*, "[i]t is required, not prohibited, that hypothetical questions be based on the evidence," and "[t]he questioner is not required to disguise the fact the questions are based on that evidence." (*Vang*, *supra*, 52 Cal.4th at p. 1041.) Thus, hypothetical questions are not improper because "they tracked the evidence in an manner that was only 'thinly disguised,'" and "it is not a legitimate objection that the questioner failed to disguise the fact the question was based on the evidence." (*Id*. at pp. 1045, 1051.) In this case, there is no dispute that the hypothetical question posed by the prosecution which Officer Stablewski was permitted to answer was rooted in the evidence presented at trial.[5]

Appellants also argue that the prosecutor's hypothetical question was improper because the prosecutor "asked whether appellant[s] had the specific intent to benefit the gang and Officer Stablewski testified they did." This assertion is not supported by the

---

[5]    Appellants point out that, after Officer Stablewski responded to the hypothetical question by opining that the shooting would have been committed for the benefit of the gang, the prosecutor asked how it would affect his opinion if he assumed that the victim was a rival gang member. While Appellants are correct that there was no evidence that the victim was a gang member, they erroneously state that the trial court overruled their objection to this follow-up question. The record reflects the trial court actually sustained the objection and Officer Stablewski never answered the question.

record.  It is true that the prosecutor made one indirect reference to Price when she stated: "Further, assume that the defendant who's driving―or, I'm sorry, the individual, 18th Street member who's driving the car, pulls up to a corner in 18th Street Gang territory." However, the prosecutor immediately apologized for the misstatement and made no further reference to Price or Machuca in posing the hypothetical.  Officer Stablewski also did not refer to Price or Machuca in responding to the question.  Therefore, when considered in its entirety, this line of inquiry does not reflect an attempt by either the prosecutor to elicit, or by Officer Stablewski to provide, an opinion on Appellants' subjective knowledge or intent.  Nor was Officer Stablewski's testimony on the subject tantamount to expressing an opinion as to Appellants' guilt.  Under these circumstances, Officer Stablewski did not invade the province of the jury in proffering his opinion, and the trial court did not err in admitting his expert testimony.

## III.    Failure to Instruct on Attempted Voluntary Manslaughter

Price asserts that the trial court erred in failing to instruct the jury sua sponte on attempted voluntary manslaughter as a lesser included offense of attempted murder.  He argues that an attempted voluntary manslaughter instruction was warranted in this case because there was evidence that the shooting was committed in a heat of passion or in imperfect self-defense.  This claim fails, however, because the evidence was insufficient to support a voluntary manslaughter instruction under either theory.

### A.    Relevant Law

"[I]t is the [trial] 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed.'  [Citation.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.)  "Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction'  [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.) Substantial evidence "is not merely '*any* evidence … no matter how weak' [citation], but rather '"evidence from which a jury composed of reasonable [persons] could …

18

conclude[]'" that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664; see also *People v. Burney* (2009) 47 Cal.4th 203, 250 ["'[t]o justify a lesser included offense instruction, the evidence supporting the instruction must be substantial — that is, it must be evidence from which a jury . . . could conclude that the facts underlying the particular instruction exist'"].) "On appeal, we review independently whether the trial court erred in failing to instruct on a lesser included offense. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 181.)

Voluntary manslaughter is "the unlawful killing of a human being without malice . . . upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) "Heat of passion arises if, "'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) "'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion,'" and the "'heat of passion must be due to "sufficient provocation."'"" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143-1144.) Voluntary manslaughter, based on imperfect self-defense, is committed when the defendant kills in "'[a]n honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury.'" (*People v. Rogers* (2006) 39 Cal.4th 826, 883.)

**B.     The Evidence Did Not Support a Voluntary Manslaughter Instruction**

Price contends that there was sufficient evidence to support an instruction on attempted voluntary manslaughter because one of the eyewitnesses to the crime reported that the victim was also firing a weapon. The record reflects that the prosecution introduced the tape recordings and transcripts of five 911 calls made during the incident. In one of the three anonymous calls, the caller told the 911 operator that she saw a man running down the street, chasing another man on bicycle, and shooting a gun at him. She described the shooter as a heavyset Hispanic man in his twenties wearing a black shirt

19

and blue jeans. She stated that the shooter "was running" and "it seemed like he was going to shoot a guy on a bike." When asked by the 911 operator to describe the man on the bike, the caller stated as follows: "The guy on the bike? He looked like he could have been Hispanic too. I – his back was to me, but he was shooting, and he had on a black shirt too."

Price claims that this statement from the anonymous caller reasonably could have supported a finding by the jury that the victim was also armed and shooting at Machuca. We disagree. The transcript of the 911 call, read in its entirety, describes a single shooter —the man who was on foot chasing the man on the bicycle. The caller repeatedly told the 911 operator that the man on foot was the person committing the shooting. She initially described that man as "going down the street chasing somebody, shooting 'em," and then clarified that the shooter "was running" and "it seemed like he was going to shoot a guy on a bike." She later reiterated that the man who had the gun was "running down the street" and "trying to shoot" the man on the bike. Although the caller made one statement that "he was shooting" as she gave a description of the man on the bicycle, she also said that "his back was to [her]." She did not make any other reference in the call to the victim carrying or shooting a gun.

In addition, none of the other witnesses who saw the man on the bicycle indicated that he was armed with a gun or shooting at the man who was chasing him. Instead, the witnesses similarly reported that the man being chased abandoned his bicycle after the first round of shots was fired and ran from the shooter. The video surveillance footage also did not show the victim holding or firing a weapon. It merely showed him on a bicycle heading in one direction as he looked back and forth over his shoulder, suddenly reversing direction as he continued to look to the rear, and then dropping his bicycle and fleeing on foot. While Price argues that the video footage supports an inference that the shooting happened suddenly, it does nothing to demonstrate that the victim provoked Machuca into firing his weapon or caused Machuca to fear for his life. Furthermore, all of the casings and bullet fragments that were recovered from the scene of the shooting were matched to the gun found at Machuca's residence. None of the evidence pointed to

20

the presence of a second firearm at the scene, or to any act of provocation or threat of violence by the victim. Because there was no substantial evidence to support a finding that Machuca fired his weapon in a heat of passion or in self-defense, the trial court did not err in failing to give an attempted voluntary manslaughter instruction.

## IV.    Sufficiency of the Evidence Supporting Price's Attempted Murder Conviction

Price also challenges the sufficiency of the evidence supporting his conviction for attempted murder. He specifically claims that the evidence was insufficient to support a finding that he aided and abetted the shooting by serving as the driver of the getaway car. We conclude that there was substantial evidence to support Price's conviction.

### A.    Relevant Law

To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict - i.e., evidence that is reasonable, credible, and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

"Penal Code section 31, which governs aider and abettor liability, provides in relevant part, '[a]ll persons concerned in the commission of a crime, whether it be felony

21

or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission … are principals in any crime so committed.'  An aider and abettor is one who acts 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.'  [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 161, fn. omitted.)  Accordingly, "'[a] person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.'  [Citation.]" (*People v. Delgado* (2013) 56 Cal.4th 480, 486, fn. omitted.)

## B.     Price's Conviction Was Supported by Substantial Evidence

Price argues that his conviction for attempted murder must be reversed because the evidence merely established that his car was used during the commission of the crime, but failed to prove that he was the driving the car or was otherwise present at the scene of the shooting.  In support of this claim, Price asserts that neither of the eyewitnesses who testified at trial identified him as the driver of the getaway car, and the only other evidence linking him to the scene of the shooting came from law enforcement officers, whose testimony was unreliable and inconsistent in certain respects.  It is well-established, however, that conflicts and inconsistencies in testimony, even those within the testimony of the same witness, are to be resolved by the trier of fact.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181 ["[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact"].)  Moreover, "unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Ibid*.; see also *People v. Richardson* (2008) 43 Cal.4th 959, 1030-1031 ["testimony of  a single witness is sufficient for the proof of any fact"].)  In this case, there was ample evidence to support a finding that Price aided and abetted Machuca in the shooting by driving the getaway car.

First, the prosecution presented substantial evidence linking Price and Machuca to the area of the crime shortly before the shooting occurred. Detective Jacinto, who had prior contacts with both men, observed them together in Price's Ford Focus less than 15 minutes before the shooting began and about two miles from where the crime took place. At that time, Price was driving the car and Machuca was the passenger. While Price challenges Detective Jacinto's identification of him as lacking in credibility, he has not demonstrated that such testimony was physically impossible or inherently improbable.

Second, there was strong circumstantial evidence showing that Price was present at the scene during the commission of the crime. The two eyewitnesses who testified at trial, White and Dempf, each recounted that a gray Ford Focus was used as the getaway car after the first set of shots was fired. While neither witness could identify Price as the driver of the car, there was testimony that they similarly described the driver as a Black male in their interviews with the police shortly after the shooting. Dempf also wrote down the license plate number of the car as the shooting was in progress, and it was almost an exact match to the license plate number of Price's Ford Focus. Based on this evidence, the jury reasonably could have inferred that Price and Machuca were still together in Price's car 10 minutes after Detective Jacinto first observed them, and that Price was acting as the getaway driver when Machuca attempted to shoot the victim.

Third, the prosecution offered substantial evidence connecting Price and Machuca to the shooting after it occurred. Machuca's house was less than 100 feet from where the second set of shots was fired. When the police arrived at the house a few minutes after the shooting was first reported, Detective Jacinto observed Price's Ford Focus parked in the driveway, still warm to the touch, and a person resembling Price fleeing from the residence. During a search of the residence that same day, the police recovered the gun that was used in the shooting. Although Detective Jacinto could not identify Price as the person fleeing, there was solid circumstantial evidence from which the jury could infer that Price parked his car at Machuca's home immediately after the shooting and fled on foot when the police arrived at the home.

23

## V. Sentencing Errors as to Machuca

On appeal, Machuca argues that his abstracts of judgment must be modified to correct two sentencing errors. First, he contends that the sentence imposed on count two (possession of a firearm by a felon) must be deemed concurrent to the sentence imposed on count one (attempted murder) because the trial court's oral pronouncement failed to indicate whether the term on count two was to be concurrent or consecutive. Second, he claims that the abstracts of judgment must be corrected to reflect that the two-year gang enhancement imposed by the trial court applied to count two rather than count one. We agree the trial court's written sentencing orders must be modified to correct these errors.

### A. Relevant Background

Machuca was convicted as charged of two counts. As to count one, the jury found him guilty of attempted willful, deliberate, and premeditated murder (§§ 664, 187, subd. (a)), with true findings on both a firearm enhancement allegation (§ 12022.53, subds. (c), (e)) and a gang enhancement allegation (§ 186.22, subd. (b)). As to count two, the jury found him guilty of possession of a firearm by a felon (§ 12021, subd. (a)), with a true finding on a gang enhancement allegation (§ 186.22, subd. (b)).

At the May 21, 2013 sentencing hearing, the trial court orally pronounced the sentence for Machuca as follows: "With respect to Mr. Machuca, probation is denied in this matter. Mr. Machuca is to be imprisoned in the state prison for a period of life. As to count 1, that term will be a minimum of 15 years. As to count 2, the court imposes a determinate sentence of 23 years and 4 months.[6] I am imposing the low term to give Mr. Machuca some inducement to program well in state prison so that he may once again enjoy his liberty if he makes prudent choices. He is a young man, I don't believe the die is necessarily cast permanently." The trial court did not state whether the sentence on

---

[6] The sentence pronounced by the trial court on count two consisted of the low term of 16 months on the underlying count, two years on the gang enhancement, and 20 years on the firearm enhancement. However, the 20-year term on the firearm enhancement should have been imposed on count one.

24

count two was to be served concurrently or consecutively.  The trial court also did not set forth any reasons for imposing a consecutive sentence.

In the clerk's May 21, 2013 minute order for the sentencing hearing, Machuca's sentence was stated differently.  As to count one, the sentence was 15 years to life with an additional 20-year term on the firearm enhancement and an additional two-year term on the gang enhancement.[7]  As to count two, the sentence was the low term of 16 months.  The minute order indicated that the sentence on count two was to "run consecutive" to the sentence on count one.

On May 23, 2013, two abstracts of judgment were filed for Machuca.  The first abstract of judgment stated that, as to count one, the sentence was the indeterminate term of 15 years to life, plus an additional determinate term of 20 years on the firearm enhancement and two years on the gang enhancement.  The second abstract of judgment stated that, as to count two, the sentence was the low term of 16 months.  Neither abstract of judgment indicated whether the sentence on count two was consecutive or concurrent.

### B.       The Count Two Sentence Is Deemed Concurrent by Operation of Law

Machuca asserts that the abstracts of judgment must be modified to reflect that the sentence on count two is to be served concurrently with the sentence on count one because the trial court failed to orally pronounce whether the term imposed on count two would be concurrent or consecutive, or to state any reasons on the record for imposing a consecutive term.  The Attorney General argues that the record establishes that the trial court intended to impose a consecutive term on count two and that any error in failing to state the reasons for a consecutive sentence was harmless.

Section 669 provides, in relevant part:  "When any person is convicted of two or more crimes, whether in the same proceeding or court or in different proceedings or courts, . . . the second or other subsequent judgment upon which sentence is ordered to be

---

[7]      Although the 20-year firearm enhancement was properly applied to count one in the clerk's minute order, the two-year gang enhancement was not.

25

executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively. . . . [¶] . . . Upon the failure of the court to determine how the terms of imprisonment on the second or subsequent judgment shall run, the term of imprisonment on the second or subsequent judgment shall run concurrently." (§ 666, subds. (a), (b).) Section 669 thus imposes an affirmative duty on the trial court to determine whether the terms of imprisonment for multiple offenses are to be served concurrently or consecutively. If the trial court fails to determine whether a sentence is concurrent or consecutive, it is deemed concurrent by operation of law. (*People v. Downey* (2000) 82 Cal.App.4th 899, 913-915; *People v. Caudillo* (1980) 101 Cal.App.3d 122, 126-127.) Additionally, the trial court must state the reasons for its sentencing choices, including the imposition of a consecutive sentence. (*People v. Sandoval* (2007) 41 Cal.4th 825, 850; Cal. Rules of Court, rule 4.406, subd. (b)(5).)

In this case, the record reflects that the trial court did not indicate at the sentencing hearing whether the term imposed on count two was to be served concurrently or consecutively. The court also did not state on the record any reasons for selecting a consecutive term. Instead, the court simply stated that it was imposing a "minimum [sentence] of 15 years" on count one, and "a determinate sentence of 23 years and 4 months" on count two. While the abstracts of judgment were also silent on the matter, the clerk's minute order affirmatively stated that the sentence on count two was to run consecutively to the sentence on count one. However, "[a]ny discrepancy between the minutes and the oral pronouncement of a sentence is presumed to be the result of clerical error. Thus, the oral pronouncement of sentence prevails in cases where it deviates from that recorded in the minutes." (*People v. Price* (2004) 120 Cal.App.4th 224, 242; see *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2 ["record of the oral pronouncement of the court controls over the clerk's minute order"].) Because the trial court's oral pronouncement of Machuca's sentence does not demonstrate an intent to impose a consecutive term, the sentence on count two must be deemed concurrent under section 669. (*People v. Downey, supra*, 82 Cal.App.4th at p. 915 [where trial court failed to designate whether terms were consecutive or concurrent, they were deemed concurrent

26

under section 669]; *People v. Caudillo, supra*, 101 Cal.App.3d 122 at pp. 126-127 [where oral pronouncement was silent on whether sentence was consecutive or concurrent, abstract of judgment provision for consecutive term did not satisfy section 669].)

The Attorney General acknowledges that the trial court failed to give any reasons for imposing a consecutive sentence, but argues that the court must have intended for the term on count two to run consecutively to the term on count one based on its statements on the record. The Attorney General notes that the trial court decided to impose the low term on count two to incentivize Machuca to perform well in prison, and claims that it would have been pointless for the court to discuss its reasons for selecting a low term if it intended for count two to be served concurrently. However, the trial court's statements about the low term on count two were in direct response to defense counsel's request for leniency as to that count given Machuca's cooperation with the police in recovering the firearm. On this record, we cannot conclude that the trial court intended to impose consecutive terms. Accordingly, because the trial court failed to orally pronounce whether the sentence on count two was to be concurrent or consecutive, it is deemed concurrent under section 669 and the minute order and abstracts of judgment must be modified accordingly. (*People v. Myles* (2012) 53 Cal.4th 1181, 1222, fn. 14 ["[w]hen an abstract of judgment does not accurately reflect the trial judge's oral pronouncement of sentence, [the appellate] court has the inherent power to correct such an error, either on [its] own motion or at the parties' behest"].)

### C. The Two-Year Gang Enhancement Must Be Applied to Count Two

Machuca also contends, and the Attorney General concedes, that the abstracts of judgment must be modified to reflect that the two-year gang enhancement imposed by the trial court at the sentencing hearing applied to count two rather than count one. We agree. Section 186.22, subdivision (b)(1)(A) provides for an additional term of two, three, or four years where the defendant is convicted of a felony committed for the benefit of a gang. Alternatively, if the defendant is convicted of a felony punishable by life imprisonment, section 186.22, subdivision (b)(5) requires that he or she serve a

27

minimum term of 15 years before being paroled.  At the sentencing hearing, the trial court correctly applied a 15-year parole eligibility gang enhancement to count one and a two-year gang enhancement to count two.  However, both the minute order and abstracts of judgment erroneously indicated that the two-year gang enhancement applied to count one, and not to count two.  The written sentencing orders must therefore be modified to strike the two-year gang enhancement from the sentence imposed on count one and to add that enhancement to the sentence imposed on count two.

## DISPOSITION

As to Machuca, the trial court's May 21, 2013 sentencing minute order is modified to strike the two-year gang enhancement from the sentence imposed on count one and to add that two-year gang enhancement to the sentence imposed on count two.  The minute order is further modified to reflect that the sentence imposed on count two is to be served concurrently with the sentence imposed on count one.  The superior court is directed to prepare corrected abstracts of judgment reflecting these modifications and to forward them to the Department of Corrections and Rehabilitation.  In all other respects, the judgments as to both Machuca and Price are affirmed.


ZELON, J.


We concur:



PERLUSS, P. J.



WOODS, J.


28